**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CHRISTOPHER J. FARRELL, M.D.,

Plaintiff,

v. Case No: 8:24-cv-2338-CEH-LSG

GULF-TO-BAY ANESTHESIOLOGY ASSOCIATES, LLC,

Defendant.

---

# ORDER

This Florida breach of contract case is before the Court on cross motions for summary judgment (Docs. 27, 29), to which the parties filed responses (Docs. 46, 51) and replies (Docs. 50, 59). The Court, having carefully considered the motions, the responses, the parties' stipulated facts and other submissions, and being fully advised in the premises, will deny Plaintiff's Motion for Summary Judgment and grant Defendant's Motion for Summary Judgment as there is no genuine issue of disputed material fact that Defendant did not breach the employment agreement.

## I. JURISDICTION AND APPLICABLE LAW

The Court has jurisdiction over this state law breach of contract action under 28 U.S.C. § 1332(a) based on diversity of citizenship and an amount in controversy that exceeds $75,000. Plaintiff Christopher Farrell, M.D. ("Plaintiff" or "Dr. Farrell") is a citizen of Florida. Doc. 1-1 ¶ 3. Defendant Gulf-to-Bay Anesthesiology Associates, LLC ("Defendant" or "GTB") is a limited liability company that is a citizen of

Delaware and Tennessee.[1] Doc. 1. This Court previously determined that Defendant's Notice of Removal proffered sufficient documentary evidence to demonstrate that the amount in controversy at the time of removal was satisfied. *See* Doc. 15 at 5–9. Florida law governs this breach of contract action. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938); *see also* Doc. 1-2 at 6.

## II. BACKGROUND AND FACTS[2]

In February 2023, Dr. Farrell entered into a Medical Professional Employment Agreement ("Employment Agreement") with GTB and began working for GTB as an anesthesiologist on August 1, 2023. Doc. 1-2. In December 2023, he gave his 90-day notice of resignation. Doc. 64 ¶ 12. Ninety days later, he stopped working for GTB on March 13, 2024. *Id.* ¶ 11.

In July 2024, Dr. Farrell filed a one-count Complaint in state court against GTB alleging breach of the Employment Agreement. Doc. 1-1. He alleges GTB breached

[1] The citizenship of a limited liability company is based on the citizenship of the LLC's members. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (per curiam). The sole member of Gulf-To-Bay Anesthesiology Associates, LLC is FGTB Holdings, LLC, which is also a Delaware company with its principal place of business in Tennessee. Doc. 1 at 2. FGTB Holdings, LLC's sole member is Team Anesthesia, LLC, a Tennessee company with its principal place of business in Tennessee. *Id.* Team Anesthesia, LLC's sole member is Team Finance, LLC, which is a Delaware company with its principal place of business in Tennessee. *Id.* Finally, Team Finance, LLC's sole member is Team Health Holdings, Inc., which is incorporated in Delaware with its principal place of business in Tennessee. *Id.*; *see also* 28 U.S.C. § 1332(c)(1) (a corporation is a citizen of the State in which it is incorporated and the State where it has its principal place of business).

[2] The Court has determined the facts, which are undisputed unless otherwise noted, based on the Joint Stipulation of Facts (Doc. 64), and the parties' submissions, including stipulations, depositions, affidavits and attachments thereto (Docs. 28, 29-1–29-5, 30, 31, 32, 51-1–51-10, 52, 53, 54). For purposes of summary judgment, the Court presents the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

the Employment Agreement in failing to provide his base salary and pediatric stipend, failing to provide personal time off as required under the agreement, failing to reimburse moving expenses, and in treating Plaintiff differently than his colleagues.[3] *Id.* ¶ 55. GTB removed the action to this Court on October 4, 2024. Doc. 1.

### A. Stipulated Facts[4]

GTB arranges for the provision of anesthesiology and pain management coverage and other mutually agreed-upon services to certain healthcare facilities, including Tampa General Hospital ("TGH"). Doc. 64 ¶ 1. GTB is the exclusive provider of anesthesiologists at TGH, where both adult and pediatric anesthesiologists must be available at all times. *Id.* ¶ 2.

Dr. Farrell is a pediatric anesthesiologist who was working in Fairfax, Virginia, in 2023. *Id.* ¶ 3. Dr. Farrell accepted GTB's offer of employment as an anesthesiologist to provide medical services for Defendant at TGH in Tampa, Florida. *Id.* ¶ 4. Dr. Farrell signed the Employment Agreement (Doc. 1-2) on February 7, 2023, and GTB executed it on February 8, 2023. Doc. 64 ¶ 9. Dr. Farrell read and understood the Employment Agreement before signing it, and his understanding of the Employment Agreement has not changed. *Id.* ¶ 6. Under the Employment Agreement, Dr. Farrell's

---

[3] In opposition to GTB's motion for summary judgment, Dr. Farrell argues that there are questions of fact, which preclude summary judgment, as to whether Defendant breached the implied covenant of good faith and fair dealing. Doc. 51 at 19-20. The Complaint does not allege a cause of action against Defendant for a breach of the implied covenant of good faith and fair dealing. *See* Doc. 1-1.

[4] Unless otherwise indicated, the facts derive from the parties' Joint Stipulation of Facts (Doc. 64).

employment was to begin on August 1, 2023. *Id.* ¶ 9. On December 14, 2023, Dr. Farrell provided 90 days' written notice of his resignation. Doc. 28-8.[5] Dr. Farrell provided medical services as an anesthesiologist for GTB from August 1, 2023 until March 13, 2024. Doc. 64 ¶ 11.

1. Employment Agreement

Under the Employment Agreement, Dr. Farrell agreed to provide medical services for GTB in exchange for compensation. Doc. 64 ¶ 7. His compensation and additional benefits included a base salary, metrics bonus, pediatric stipend, sign-on bonus, personal time off ("PTO"), reimbursement of moving expenses, and eligibility for health insurance, dental insurance and retirement benefits. Doc. 1-2 at 3, 10. The pertinent sections of the Employment Agreement provide:

a. Section 3 states:

> Scheduling: Professional agrees to provide Services at Facilities during mutually agreeable shifts in accordance with the minimum scheduling requirements as set forth in Addendum "1". Unless otherwise specifically stated in this Agreement (including Addendum[s] thereto) or mutually agreed upon by the parties. In the event that Professional is or becomes unable to provide Services as scheduled by Company, Professional must immediately notify Company and, except in cases of emergency or an approved absence, locate a replacement to fill Professional's vacant shift in order that the schedule may be filled.

b. Paragraph 3 of Addendum "1" states:

[5] The parties stipulated that written notice of resignation was provided on December 13, 2023. Doc. 64 ¶ 12. Dr. Farrell's resignation letter is dated December 14, 2023. Doc. 28-8. In any event, there is no dispute that 90-days' written notice was provided pursuant to the Employment Agreement.

> Schedule/Call Requirements: As required by the Facilities and as reasonably scheduled by Company commensurate with the other professionals providing services at the Facilities on behalf of the Company.

c. Section 5 states:

> Service Compensation. In consideration for assigning Professional's professional fees to Company and in consideration for the Services, Professional shall be paid the amounts stated in Addendum "1."

d. Section 6 states:

> Benefits. As an employee, Professional shall be eligible to receive benefits offered by Company to similarly situated employees, including health insurance, dental insurance, retirement plans, and similar benefits. Such benefits shall be subject to change by Company from time to time upon written notice to Professional.

e. Paragraph 4 of Addendum "1" states:

> 4. Service Compensation. In consideration for assigning Professional's professional fees to Company, and in consideration for the Services, Professional shall be paid the following compensation:
>
> > (a) Base Salary. For so long as this Agreement continues in force, as compensation for all services rendered by Professional and all work to be performed by Professional under this Agreement, Professional shall receive an amount equal to Four Hundred Fifty Thousand and No/100 Dollars ($450,000.00) per year, payable in installments corresponding to Company's regularly scheduled pay cycles.
> >
> > (b) Metrics Bonus. Professional shall be eligible to receive an annual Metrics Bonus of up to Twenty-Five Thousand and No/100 Dollars ($25,000.00). The metrics parameters shall be shared with Professional, and performance shall be measured and shared with Professional regularly. Professional shall be entitled to receive the applicable portion of the Metrics Bonus within 45 days after completion of each calendar quarter, based on Professional's performance over the Measured Period ending in that calendar quarter. For purposes of this Section, "Measured Period" is

defined to be such rolling three-month period established by the Company to assess Professional's eligibility for a Metrics Bonus. Professional shall be entitled to receive a Metrics Bonus with respect to a given calendar quarter only if Professional was employed by Company for the entire duration of that calendar quarter. Company reserves the right to revise the methodology used to calculate or determine the Measured Period or metrics performance.

(c) Pediatric Stipend. Company will pay Professional an annual stipend of One Hundred Thousand and No/100 Dollars ($100,000.00) in recognition of Professional's ongoing competence and provision of pediatric anesthesia care during this Agreement, which will be paid in equal biweekly installments during Company's regular pay periods following completion of each full 2-week period of full-time active employment services performed at Facility in accordance with this Agreement.

(d) Sign-On Bonus. Company agrees to pay to Professional a Sign-On Bonus of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) (the "Sign-On Bonus") as follows:

(i) First Installment. Fifty Thousand and No/100 Dollars ($50,000.00) ("First Installment") payable to Professional in Professional's paycheck in the first full pay period following Commencement Date. In the event that the Professional does not remain continuously employed by Company for at least twelve (12) months after the actual start date of services in accordance with the Agreement, Professional shall repay the entire gross amount of Fifty Thousand and No/100 Dollars ($50,000.00), of the first installment of the Sign-On Bonus which repayment will be due immediately.

. . .

f. Paragraph 5 of Addendum "1" states:

5. Additional Benefits. During active employment services performed pursuant to this Agreement, upon request by Professional, Company shall offer the following additional benefits:

(a) Personal Time Off. During each calendar year during active employment services performed in accordance with

this Agreement, subject to Section 1 above, Professional shall be entitled to ten (10) weeks of absence from Professional's duties hereunder for sick leave, personal leave, vacation, continuing medical education, or professional meeting absence (pro-rated as appropriate). The specific dates and availability for paid absence for sick leave, personal leave, vacation or professional meetings shall be mutually agreed upon, in advance, by Company and Professional and shall be subject to Company's staffing and scheduling needs. Unused or unavailable leave time shall not carry over beyond the current calendar year, and the Professional shall not be entitled to any compensation for such unused or unavailable leave time unless approved in advance by Company in accordance with Addendum 1 attached hereto and incorporated herein by this reference.

Because PTO resets at the beginning of each calendar year, Professional may not have accrued sufficient PTO to permit paid time off early in the year. Consequently at any time, Professional may be permitted to take up to 40 hours of PTO that have not yet been accrued. Professional shall require the Company's advance approval, which may be withheld at the Company's sole discretion, to incur a negative PTO balance greater than 40 hours. Any negative PTO balance shall be carried over from year to year.

<u>PTO Obligations upon Termination</u>: Professional shall not be entitled to any payout for accrued but unused PTO upon the termination of this Agreement for any reason. Professional shall be required to immediately reimburse the Company for any negative PTO balance upon the termination of this Agreement for any reason. Furthermore Professional expressly authorizes the Company to withhold from Professional's final paychecks or reimbursements any amount due to the Company due to a negative PTO balance. Professional shall nevertheless be liable to the Company for any negative PTO balance not satisfied by such withholdings. The provisions of this paragraph represent Company policy, and each shall apply in every instance where state or other then applicable law does not require otherwise.

> (b) Moving Expenses. The Company will provide one-time reimbursement to Professional for actual and documented moving expenses incurred by Professional, up to a maximum of Fifteen Thousand and No/100 Dollars ($15,000.00). In the event that Professional does not remain continuously employed by Company for at least twenty-four (24) months after the actual start date of services in accordance with this Agreement, Professional shall repay a prorated portion of the Moving Expenses one-time reimbursement based on the number of months of full-time active employment services not completed during such twenty-four (24) month period. Professional agrees that any Moving Expenses one-time reimbursement to be repaid may be offset against amounts due from Company to Professional pursuant to this Agreement. Professional further agrees that such offset or repayment may begin as soon as any applicable notice of termination pursuant to this Agreement (the "Notice Period") is provided by Professional or Company to the other party. Professional hereby authorizes Company to withhold repayment from any payments owed to Professional during the Notice Period. Professional shall repay Company any remaining balance not offset as described above.
>
> (c) Entire Compensation. Except as set forth in this Addendum 1, Professional shall be entitled to no other compensation or benefits from Company.

Doc. 1-2 at 2–3, 9–10.

2. Moving Expenses

GTB originally offered to reimburse Dr. Farrell $5,000 for moving expenses, but this amount was increased to $15,000.00 in the Employment Agreement per Dr. Farrell's request. Doc. 64 ¶ 8. GTB provided Dr. Farrell with the Relocation & Moving Expense Guidelines and a relocation expense form, along with instructions on submitting the form and receipts. *Id.* ¶ 13; *see also* Docs. 29-2, 29-5. On August 5, 2023, Plaintiff submitted a signed reimbursement form and a receipt to the email address

identified in the Relocation & Moving Expense Guidelines. Doc. 64 ¶ 14; *see also* Doc. 29-3 at 3–4. On August 30, 2024, Defendant issued a check to Plaintiff for a gross amount of $4,637.40 for moving expenses. Doc. 64 ¶ 25. Plaintiff did not deposit this check. *Id.* ¶ 26.

3. PTO and Post-Midnight Call

GTB's practice is to schedule PTO for the upcoming calendar year in October of the preceding year via a lottery or draft system in which providers who are currently employed take turns picking PTO weeks for the upcoming year. Doc. 64 ¶ 15. Dr. Farrell was not included in the lottery for the 2023 calendar year, as it took place in October 2022. *Id.* ¶ 16. GTB correctly prorated Dr. Farrell's PTO allotment for 2023, allotting him 21 days of PTO.[6] *Id.* ¶ 17.

When he was hired, Dr. Farrell was aware of the policy of scheduling PTO in October of the preceding year via a lottery system (Doc. 30 at 66:19–67:10), but he denies being aware of how disadvantageous the lottery system was to new hires (Plaintiff's Declaration, Doc. 54 ¶ 3). He asserts that once he began working, he discovered how the PTO lottery was known to disadvantage new hires. Doc. 30 at 29:7–12, 150:13–151:3. For example, he was unaware that only six physicians could be off on a given day until he had been employed with GTB for nearly two months. (Doc. 54 ¶ 7).

[6] The Agreement entitled him to ten weeks of PTO per calendar year, but because he began in August, Dr. Farrell was entitled to 21 days of PTO for 2023, which was the pro-rated amount. Doc. 30 at 94:20–95:7.

Dr. Stephanie Lewis is GTB's Assistant Facility Medical Director of Clinical Operations who oversaw scheduling of PTO in 2023. Doc. 64 ¶ 18. In a May 6, 2023 email to Dr. Lewis, Dr. Farrell acknowledges that PTO had already been selected by the existing anesthesiologists and that PTO does not carry over to the next calendar year. Doc. 30-1 at 28. Given that, he inquired as to the process for new hires. *Id.* Dr. Lewis told Dr. Farrell to email her his proposed PTO dates. *Id.* at 27. On July 24, 2023, Dr. Farrell requested some, but not all, dates. *Id.* at 25. He was approved for all dates requested except October 27th. Doc. 30 at 111:6–24. In her July 24, 2023, response email, Dr. Lewis initially denied Dr. Farrell's request to take PTO on October 27, 2023, because at the time of Dr. Farrell's request the "maximum allotted physicians are also on PTO that day." Doc. 28-9 at 3. A month later, on August 21, 2023, Dr. Lewis granted a PTO request for Dr. Audrey Vizzi to be on leave on October 27, 2023. Doc. 64 ¶ 20. On October 20, 2023, Dr. Lewis approved Dr. Farrell's requested PTO for October 27th. *Id.* ¶ 21.

On August 29, 2023, a scheduling manager emailed Dr. Farrell to let him know he still had 14 days of PTO to schedule. Doc. 30-1 at 36–37. On October 19, 2023,[7] Dr. Farrell requested and was approved for three days later that month. *Id.* at 35, 36. On November 16, 2023, he requested three more days, two of which were approved on November 20 and the third requested day was approved November 21. *Id.* at 33–

[7] GTB states Dr. Farrell waited until October 19, 2023, in which to make any requests, but Plaintiff claims he communicated verbally and by text message with Dr. Lewis between August 1 and October 19 and only a few weeks were available. Doc. 27 at 10; Doc. 51 at 9.

35. On November 30, 2023, Dr. Farrell requested seven of his eight remaining days of PTO for December 2023.[8] *Id.* at 33. Because only one of the requested dates was available, Dr. Lewis offered Dr. Farrell working PTO for the other days. *Id.* at 32. Dr. Farrell was not interested in being paid for working PTO but instead wanted the time off to assist his dad.[9] *Id.* On November 30, 2023, Dr. Farrell wrote to Dr. Weiss, the System Medical Director for Anesthesia Services at TGH, and said "I'm having trouble scheduling the PTO I am due by the end of December since I hadn't even applied when the 2023 schedule was made. I'm not really interested in having to work while [on] PTO. Any thoughts so that the advertised PTO when I took the job isn't fiction? I'd prefer not to call out but may have no other choice." Doc. 64 ¶ 22; Doc. 30-1 at 39.

Later on that same day, Dr. Lewis emailed Dr. Farrell approving five of his requested seven days and requesting he advise which days he would like to schedule working PTO for his three remaining PTO days. Doc. 30-1 at 31. On December 5, Dr. Farrell emailed three dates he would like to take working PTO, which Dr. Lewis confirmed by email the next day. *Id.* at 30. One of the dates he intended to take working

[8] It is unclear whether Dr. Farrell made a specific date request for the 8th and final day of PTO that he was due.

[9] Dr. Farrell testified that while he was on PTO at the end of September 2023, his father went into cardiac arrest in New Jersey and had to be intubated in the ICU. Doc. 30 at 127:24-128:3. Dr. Farrell had to urgently fly home to New Jersey. *Id.* at 128:3. The remainder of his PTO week was spent in New Jersey with his father. *Id.* at 128:14-15. While there, he texted Dr. Lewis and Dr. Wu to explain what transpired and to let them know that going forward his PTO needs would be unpredictable based on his father's needs. *Id.* at 128:7-12. According to Dr. Farrell, as of October 1, his PTO "transitioned from vacation time to family crisis and medical management time." *Id.* at 128:18-20.

PTO (December 8), he was sick and ended up getting the day as a PTO day. Doc. 30 at 172:9-24. Dr. Farrell was paid extra for the two working PTO days. Doc. 30 at 173:2-6. But, he contends he never actually received extra payment for the two working PTO days because his wages were garnished (as part of the recoupment of the sign-on bonus) after he gave notice of his resignation. *Id.* at 213:20–25. He claims he was scheduled differently than other professionals and was denied PTO requests at a higher rate than other professionals. Doc. 54 ¶¶ 13–15.

On December 5, 2023, Plaintiff was on call and worked until 1:00 or 2:00 a.m. on December 6, 2023. Doc. 64 ¶ 23. Dr. Farrell had PTO scheduled for December 6, 2023. Doc. 30 at 198:4–7. Because he worked past midnight, Dr. Farrell testified his PTO day should have been restored (and not doing so was a breach of his contract) because standard operating protocol when working past midnight was that a professional would be entitled to have that day off without using PTO. *Id.* at 198:11–199:6. Dr. Farrell acknowledges this practice or protocol is not contained in the Employment Agreement. *Id.* at 199:4–9. However, he testified that he was told verbally during orientation that if he works past midnight, he would be off the next day. *Id.* at 199:9-12. And he observed colleagues who were called in after midnight and were off the next day without it being taken as a PTO day. *Id.* at 199:12-15.

4. Sign-On Bonus

Dr. Farrell received a $50,000 signing bonus shortly after he began working for GTB. Doc. 30 at 78:7–9. This was the first of three equal installments to be paid over two years per the Employment Agreement. *Id.* at 77:22–78:22; Doc. 1-2 at 9. While

GTB would ordinarily be entitled under the Agreement to recoup the sign-on bonus when Dr. Farrell gave notice of his resignation, Dr. Farrell claims that GTB was not permitted to do so because of what he considers to be prior breaches. Doc. 64 ¶ 24. He testified that the breaches included not getting all of his PTO for 2023, the scheduling of PTO via the lottery system which did not give him equal access to days, the failure to pay the $15,000 moving expenses, and using his PTO on a day that he was on call after midnight. Doc. 30 at 80:25–81:5.

**B. Summary Judgment Motions**

1. GTB's Motion (Doc. 27)

GTB moves for summary judgment in its favor on Plaintiff's sole claim for breach of contract arguing there was no breach, or at least no material breach. Additionally, Defendant seeks summary judgment on its affirmative defense of Plaintiff's failure to mitigate. GTB submits that Dr. Farrell's Complaint centers around his PTO days, but GTB notes that Dr. Farrell was able to take 19 of his 21 days off. For the remaining two days, GTB paid him a premium for working those PTO days. GTB argues that Dr. Farrell's inability to take two PTO days was not a breach of the Employment Agreement.

Regarding the relocation expenses, GTB argues that per the Employment Agreement, Dr. Farrell was entitled to reimbursement of only a pro-rated portion of his moving expenses, which he was ultimately paid.

Dr. Farrell's complaint that he was treated unfairly derives primarily from the fact that he was unable to participate in the preceding year "lottery" to select PTO for

the upcoming year. GTB argues that Dr. Farrell could not have participated in the lottery because it took place in October of the prior year before he had started working for GTB. But even assuming Plaintiff was treated "unequally," which GTB denies, the Employment Agreement does not include an equality provision.

Finally, as to the recouped sign-on bonus, GTB contends the Employment Agreement expressly permits GTB to recoup the bonus because Dr. Farrell did not remain continuously employed for the 12 months after his start date.

2. Dr. Farrell's Motion (Doc. 29)

Dr. Farrell moves for summary judgment in his favor on the issue of GTB's breach in failing to reimburse his moving expenses as required by the Employment Agreement. Dr. Farrell contends that GTB's failure to pay his relocation expenses was a material breach of the express terms of the Employment Agreement which excused his further performance under the Agreement. Additionally, Dr. Farrell argues that GTB's Second, Third, and Sixth Affirmative Defenses are duplicative of the First Defense and are insufficient as a matter of law. Dr. Farrell further argues that the Fourth, Fifth, Seventh, and Eighth Affirmative Defenses are legally and factually unsupported.

## III. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under

consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## IV. DISCUSSION

Through this lawsuit, Dr. Farrell contends that GTB materially breached the Employment Agreement by not reimbursing his moving expenses, not treating him equally with other providers, and not providing him with all of his PTO, and that those breaches, individually or collectively, excused his obligations under the contract, including the obligation to return the sign-on bonus or any portion of his moving expenses. He seeks summary judgment on his breach of contract claim based on GTB's failure to pay his moving expenses. GTB seeks summary judgment in their favor on any claim by Dr. Farrell of breach of the Employment Agreement, arguing there was no material breach. Dr. Farrell responds that there are other breaches and disputed issues of fact that preclude summary judgment. Because the undisputed material facts demonstrate that there was no breach of the Employment Agreement, GTB is entitled to summary judgment in its favor and against Dr. Farrell.

To prove a breach of contract under Florida law, a plaintiff must prove: "(1) a valid contract existed; (2) a material breach; and (3) damages." *Taboada v. Duarte*, 393

So. 3d 775, 778 (Fla. 3d DCA 2024), *reh'g denied* (Sept. 26, 2024); *see also Havens v. Coast Fla., P.A.*, 117 So. 3d 1179, 1181 (Fla. 2d DCA 2013); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. 4th DCA 2008)). Here, the parties do not dispute the Employment Agreement is a valid contract.[10] Doc. 29 at 12; Doc. 27 at 6. At issue is whether there was a material breach of the contract.

"To constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract.'" *Covelli Fam., L.P. v. ABG5, L.L.C.*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008) (quoting *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So. 2d 853, 857 (Fla. 4th DCA 1972)). And the breach must be of "such significance that it relieves the injured party from further performance of its contractual duties." *Burlington & Rockenbach, P.A. v. L. Offs. of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th DCA 2015) (citing *Covelli Family*, 977 So. 2d at 752). A party's "failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach." *Covelli Family*, 977 So. 2d at 752. Not all terms of a contract are essential merely because they are included in a contract—rather, what is an essential term "will vary widely according

[10] The existence of an ambiguity in a contract may preclude the entry of summary judgment. *Holmes*, 260 So. 3d at 403–04. And whether or not a contract is ambiguous is a question of law for the court to decide. *Talbott v. First Bank Florida, FSB*, 59 So. 3d 243, 245 (Fla. 4th DCA 2011). Neither party here has argued that the Employment Agreement is ambiguous, and based on the Court's review of the contract as a whole, the Court concludes that the Employment Agreement is not ambiguous. *See, e.g., Maines v. Davis*, 491 So. 2d 1233, 1235 (Fla. 1st DCA 1986) (holding that contract should be "considered as a whole, not in its isolated parts").

to the nature and complexity of each transaction." *Socarras v. Claughton Hotels, Inc.*, 374 So. 2d 1057, 1060 (Fla. 3d DCA 1979).

Generally, the issue of "whether an alleged breach is material under Florida law is a question of fact." *Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*, No. 21-10242, 2022 WL 6635136, at *4 (11th Cir. Oct. 11, 2022) (citing *Covelli Fam., L.P.*, 977 So. 2d at 752; *Moore v. Chodorow*, 925 So. 2d 457, 461 (Fla. 4th DCA 2006). But where there are no material facts that are in dispute, as is the case here,[11] and the "determination of the issues of a lawsuit depends upon the construction of a written instrument and the legal effect to be drawn therefrom, the question at issue is essentially one of law only and determinable by entry of summary judgment." *Holmes v. Fla. A & M Univ. by & Through Bd. of Trs.*, 260 So. 3d 400, 403 (Fla. 1st DCA 2018) (quoting *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092 (Fla. 1st DCA 1999)). As no material facts are in dispute, the Court may decide the issues on the instant motions as a matter of law.

The Court addresses each of the claims of purported breach in turn below.

### A. Moving Expenses

The Employment Agreement allowed for reimbursement of up to a maximum of $15,000 in relocation expenses. Doc. 1-2 at 10. This contractual benefit appears in the Employment Agreement under the heading "Additional Benefits." *Id.* The

---

[11] In response to GTB's summary judgment motion, Dr. Farrell argues that there are other breaches and disputed issues of fact that preclude summary judgment in favor of the defense. Because the facts he raises are undisputed, immaterial, or were not raised by his Complaint, none of the purported disputes in fact defeat GTB's motion.

provision does not include a deadline or time frame for payment. Dr. Farrell moves for summary judgment on GTB's breach of the Employment Agreement arguing that GTB did not pay his moving expenses, which he asserts was a material part of the negotiations and consideration promised in exchange for his willingness to move to Florida and take the position with GTB. Doc. 29.

For its part, GTB moves for summary judgment on the issue of the moving expenses arguing that there can be no breach of contract because GTB has already paid the amount of the relocation reimbursement to which Dr. Farrell was entitled and the Employment Agreement did not include a deadline by which reimbursement had to be made. Doc. 27 at 21–22.

It is undisputed that GTB did not pay Dr. Farrell's moving expenses while he was still employed. It is also undisputed that the Employment Agreement did not include a deadline for reimbursement of moving expenses and that he ultimately received a check for the accurate pro-rated amount to which he was entitled given the number of months he was employed.

On August 5, 2023, Dr. Farrell submitted his request for reimbursement to GTB on the form provided by Defendant, along with a copy of his receipts. Doc. 29-3. Dr. Farrell contends that GTB's form and its own guidelines provided that reimbursement would be received in the next regularly scheduled payroll. Doc. 29-3 at 3; Doc. 29-2. However, the form indicates that payment is to be made once approved. Dr. Farrell relies on the August 7, 2023, Scott Bowers email to demonstrate approval was given, *see* Doc. 29-4, but the email exchange between Bowers and Ronnie Williams merely

reflects Bowers' confirmation of the amount of moving expenses Plaintiff's Agreement provided for. But even if the Bowers' email constituted "approval," the Guidelines are not a part of the Employment Agreement.

Dr. Farrell acknowledges that, after this lawsuit was filed, GTB provided a "small partial payment" of $4,637.40, but he did not deposit the check. Dr. Farrell argues that the Employment Agreement does not contemplate payment of moving expenses after the termination of the Agreement. Because GTB failed to pay for his moving expenses during the term of the Agreement despite Dr. Farrell repeatedly asking, Dr. Farrell claims he resigned his employment with ninety days' notice.

Dr. Farrell contends that he specifically negotiated the increased relocation expenses as part of his compensation[12] and GTB did not make the payment as promised. He further argues that compensation is a material term in the context of an employment agreement and that the material breach allowed him to treat the breach as a discharge of his contractual liability, including any obligation to repay his signing bonus or the prorated amount of his moving expenses. *See* Doc. 29 at 12.

Even accepting that he negotiated a higher moving expense allowance, reimbursement of relocation expenses was provided as an "additional benefit" under the Agreement, not as compensation for medical services. Doc. 1-2 at 9-10. Critically, the Employment Agreement did not include a deadline for relocation reimbursement

[12] Dr. Farrell's January 23, 2023 email merely states he is "curious" about whether the $5,000 moving expenses is "standard" as his research revealed it would cost three times that amount to complete his move from Northern Virginia to Tampa. Doc. 30-1 at 3. GTB responds to his email within the hour stating they can increase his moving expenses to $15,000. *Id.*

and, under the agreement, Dr. Farrell was only entitled to the pro-rated amount (which he received) of his requested expenses because he did not remain employed for at least 24 months. GTB contends that the check for $4,637.40 represented his pro rata share, given Dr. Farrell's short tenure. Dr. Farrell chose not to deposit the check.

Construing the facts in a light favorable to Dr. Farrell, his claim that GTB breached the Employment Agreement by not paying his moving expenses fails. GTB gave Dr. Farrell $4,637.40 in reimbursement for his moving expenses. Dr. Farrell does not dispute that this amount was pro-rated accurately based upon the period of time he was employed. Doc. 30 at 195:4–196:14. Although he did not deposit the check because he thought he was entitled to the full $15,000, Dr. Farrell did receive an accurate pro-rated payment for his moving expenses given his March 2024 resignation. To be entitled to the full $15,000, Dr. Farrell would have had to continue working for GTB for twenty-four months until August 2025. He worked from August 1, 2023 to March 13, 2024, approximately seven and one-half months. This equates to only about 30% of the 24-month period needed to be entitled to the full reimbursement of $15,000 under the Employment Agreement.

Dr. Farrell argues that a reasonable deadline for payment is implied by law making the delay in payment of more than a year after he submitted the reimbursement form a breach of the Employment Agreement that was material. "The general Florida rule is that when a contract does not expressly fix the time for performance of its terms, the law will imply a reasonable time." *De Cespedes v. Bolanos*, 711 So. 2d 216, 218 (Fla. 3d DCA 1998) (citations omitted). Given the language of the agreement and the

circumstance of this case, the delay was less than six months and the timing of GTB's payment was not unreasonable. First, there was no breach because Dr. Farrell received the amount he was owed, and he acknowledges that the Employment Agreement did not include a deadline for the payment. Doc. 30 at 190:23–24. Moreover, in his follow-up inquiries to GTB about the reimbursement, a GTB representative told him that reimbursement "could take a while." He was also told that GTB changed the method in which it reimbursed and therefore it was taking longer.[13] *Id.* at 191:14–192:2. After those two inquiries, he did not follow up further. *Id.* at 192:3–6. And when he resigned, he did not cite any cause for his resignation.[14] *See* Doc. 28-8.

Second, under the terms of the Employment Agreement, Dr. Farrell was only entitled to the full $15,000 in reimbursement for moving expenses if he worked continuously for 24 months. Thus, how much he ultimately would be entitled to (based upon how long he remained continuously employed) would not be known until after two years or when he left employment, whichever came first. As such, the delay in reimbursement, at most, was five and one-half months, calculating from his last day in March until the end of August when he received the reimbursement check.

[13] This further supports that the Bowers' email did not constitute an approval of Plaintiff's request for reimbursement.

[14] Dr. Farrell's resignation letter references Section 11.2 of the Employment Agreement, which is the Termination "Without Cause" provision. *See* Doc. 28-8; Doc. 1-2 at 4. And Plaintiff's reliance on GTB's Guidelines is similarly unavailing, as the Guidelines were not made a part of the Employment Agreement.

The delay in reimbursing the moving expenses was not a material breach of the Employment Agreement.[15] "[T]rivial noncompliance and minor failings do not constitute material breaches." *Burlington & Rockenbach*, 160 So. 3d at 960 (citing *Covelli Family*, 977 So.2d at 752). Under Florida law, a late payment constitutes a material breach where time is of the essence. *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) (citing *Sublime, Inc. v. Boardman's Inc.*, 849 So.2d 470, 471 (Fla. 4th DCA 2003)). Florida courts will find that time is of the essence when an agreement so states, when it may be determined from the subject matter of the contract, when treating time as non-essential would produce a hardship, or when notice is provided to the defaulting party requesting performance within a stated reasonable time. *Sublime, Inc.*, 849 So. 2d at 471.

The material facts here are undisputed. Dr. Farrell was paid his pro rata share of moving expenses given his term of employment, but it was paid after he filed this lawsuit. The moving expenses were categorized as "additional benefits" in the Employment Agreement; they were not identified as "compensation" as Plaintiff argues. There is no evidence Plaintiff suffered a financial hardship due to the delay in receiving the reimbursement of his moving expenses. The Employment Agreement did

[15] In his response to GTB's motion for summary judgment, Dr. Farrell argues that GTB concedes that the relocation expense provision is a material term in the contract. Doc. 51 at 3 (citing Doc. 27 at 6). But the issue is whether the *breach* was material, that is, whether it went to the essence of the contract. As discussed in this Order, the Court concludes Dr. Farrell received the amount he was entitled to under the Agreement for moving expenses and the fact that the payment was delayed did not go to the essence of the employment contract.

not include a deadline for reimbursement of moving expenses. Dr. Farrell submitted his resignation without cause.

Under the Employment Agreement, Dr. Farrell agreed to provide pediatric anesthesiology services in Tampa in exchange for compensation consisting of an annual base salary of $450,000, plus eligibility for an annual $25,000 metrics bonus, plus an annual $100,000 Pediatric Stipend in recognition of his competence and specialty paid in equal bi-weekly installments, plus a $150,000 sign-on bonus paid in three equal installments over two years.[16] Doc. 1-2 at 9–10. At most, the additional benefit of reimbursement of up to $15,000 in moving expenses, to which he was entitled only if he worked the full 24 months, would be considered a "minor" part of GTB's obligations under the Agreement. *See Covelli Fam., L.P.*, 977 So. 2d at 752; *Beefy Trail*, 267 So. 2d at 857. GTB's delayed payment of the $4,637.40 in moving expenses did not go to the essence of his employment contract as a pediatric anesthesiologist and therefore was not a material breach of the Employment Agreement. Accordingly, Dr. Farrell's motion for summary judgment (Doc. 29) that GTB materially breached the Employment Agreement as it relates to the reimbursement of moving expenses is due to be denied. As there was no material breach of the Employment Agreement arising out of GTB's delayed payment of moving expenses, GTB is entitled to summary judgment in its favor on the breach of contract claim related to this issue.

[16] This amounts to $675,000 in compensation and bonuses for his first full year and a total of $1,300,000 under the Agreement if he worked a full two years.

**B. Duty of Good Faith and Fair Dealing**

In Florida, every contract contains an implied covenant of good faith and fair dealing, which requires the parties to "follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005); *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1183-84 (Fla. 2d DCA 2000). "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Centurion Air Cargo, Inc.*, 420 F.3d at 1151. The implied covenant "is usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004).

Dr. Farrell argues that GTB's motion must be denied because there is a genuine dispute of material fact as to whether GTB breached the implied covenant of good faith and fair dealing. Doc. 51 at 19–20. Dr. Farrell's argument fails for several reasons.

First, Dr. Farrell never brought a claim against GTB for the breach of the implied covenant of good faith and fair dealing. And he may not amend his Complaint to add such a claim by way of his summary judgment briefing. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (liberal pleading standard does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage). While he argues that under Florida law, a breach of the implied covenant of

good faith and fair dealing is not an independent cause of action, it is nevertheless a derivative claim which may be brought in conjunction with a breach of contract claim in limited circumstances. *See, e.g., Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001) ("a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached"); *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.*, 710 So. 2d 573, 575 (Fla. 4th DCA 1998) ("With respect to Appellee's claimed breach of an implied duty of good faith, a duty of good faith must relate to the performance of an express term of the contract[.]"). Here, Plaintiff chose not to file a claim for the breach of the implied covenant of good faith and fair dealing in his Complaint. *See* Doc. 1-1.

Second, because the Court concludes in this Order that there was no breach, any claim of breach of the implied covenant of good faith and fair dealing would necessarily fail. *See Ahearn v. Mayo Clinic*, 180 So. 3d 165 (Fla. 1st DCA 2015) (holding good faith and fair dealing claim was extinguished where breach of contract claim is extinguished or rendered moot).

Third, Plaintiff's laundry list of facts (Doc. 51 at 20)—without analysis, development of argument, or citation to authority—fail to demonstrate the existence of a disputed material fact to preclude summary judgment. The following facts, which Dr. Farrell argues create genuine disputes that preclude summary judgment, are immaterial, not in dispute, are not tethered to an express term of the contract, or were never a basis of Plaintiff's breach of contract claim:

- agreeing to pay Plaintiff a higher amount of compensation for moving expenses to induce him to sign the agreement and then refusing to pay any compensation during his employment

There is no evidence that the increase from $5,000 to $15,000 in moving expenses induced Dr. Farrell to accept the position as a pediatric anesthesiologist for which he was to be paid a base annual salary of $450,000, and up to $400,000 in bonuses/stipends after two years of employment. In any event, the Employment Agreement did not have a deadline for when moving expenses were to be paid; Dr. Farrell was not entitled to full reimbursement because he worked less than 24 months; and Dr. Farrell was ultimately paid what he was entitled for his moving expenses.

- refusing to pay the moving expenses but paying them to other physicians

In his Declaration, Dr. Farrell states that Dr. Angela Neubeck, who began her employment a few months before he did, received her moving expenses within 60 days of submitting her request. Doc. 54 ¶ 11. As discussed in this Order, the moving expenses—which he ultimately received—were only a minor obligation under the Agreement and did not constitute the essence of the Agreement.

- creating a lottery system that frustrated Plaintiff's ability to use the PTO allotment

Dr. Farrell was aware of the lottery system before he began employment. He participated in the lottery system, without problem, for the calendar year 2024. *See* Doc. 30 at 173:10-21. The Employment Agreement provided that scheduling and on-call requirements would be done based on staffing needs. GTB had to have a way to

track requested PTO. Dr. Farrell acknowledged it would not be feasible to re-do PTO requests every time a new professional is hired. Any change to the way GTB conducts its PTO lottery after Dr. Farrell left would be irrelevant to whether GTB breached the agreement with him.

- claiming that Plaintiff's inability to use leave was due to his delay when Dr. Lewis encouraged him to delay his requests

Although Plaintiff does not explain it, this statement appears to relate to Dr. Lewis's email declining his initial request for PTO on October 27 and her suggestion that PTO may open up closer in time to the date he requested. Doc. 28-9 at 3. It is not relevant. Dr. Farrell ultimately received PTO on October 27th.

- assisting other physicians in utilizing their PTO allotment but not providing Plaintiff the same opportunity

Dr. Farrell asserts that he was denied PTO at a far greater rate than the other professionals. Doc. 64 ¶¶ 14, 15. But the Employment Agreement did not guarantee identical treatment. The Agreement provided that scheduling would be reasonable and commensurate (not identical) with other professionals, subject to the staffing needs of the hospital. Dr. Farrell waited until November 30 before requesting 7 of his 8 remaining PTO days. The records he attaches to his Declaration regarding other professionals' PTO requests reflect many of the requests were made earlier in the year and not at the last minute. Dr. Farrell acknowledged that a request made late in the year which could not be accommodated would not be a breach.

- denying leave to Plaintiff but granting leave for the same day to another physician who made a later request

GTB does not keep wait lists for PTO days, and Plaintiff ultimately received October 27th off.

- refusing compensation to Plaintiff for unused PTO when it was within the discretion of Defendant to provide it

There was no guarantee under the Employment Agreement that Dr. Farrell would be entitled to be paid for working PTO. The Employment Agreement specifically provides that a professional is not entitled to compensation for unused or unavailable PTO unless approved in advance. In any event, Plaintiff was paid a premium for his two days that he took working PTO.

- reducing Plaintiff's pay when Defendant already breached the agreement

Per the Agreement, GTB could recoup the sign-on bonus through offsets to Plaintiff's salary. Doc. 1-2 at 10.

- refusing to use "p.r.n." employees to honor the contractual commitment of leave to Plaintiff

Nothing in the Employment Agreement obligated GTB to use p.r.n. employees to cover shifts so that Dr. Farrell could take any day of PTO he wanted. Moreover, this fact was never raised as a basis in the Complaint for Plaintiff's breach of contract claim.

- engaging in hostility towards Plaintiff when he complained about Defendant's breach of the PTO allotment and requirement of "working PTO"

Plaintiff's claim of hostility is not relevant to his breach of contract claim. He received 19 of 21 days of PTO. He was paid extra for working the remaining two days of his PTO. The Employment Agreement did not guarantee that all PTO would be used or available. To the contrary, it contemplated that it may not be used or unavailable and, in such cases, the PTO would not carry over.

None of the facts raised by Plaintiff create a genuine dispute of material fact on the issue of whether GTB breached the Employment Agreement.

**C. Unequal Treatment**

In his Complaint, Dr. Farrell alleges that GTB breached the Employment Agreement by treating him differently than his colleagues. Doc. 1-1 ¶¶ 14-16, 28. In support of his claim of breach for this reason, Dr. Farrell points to the provisions in the agreement that he is to be scheduled for "mutually agreeable shifts," "commensurate with the other professionals providing services" and that he is eligible to receive benefits offered to "similarly situated employees." *See* Doc. 1-2 at 2, 3, 9. He alleges that he never agreed to be treated unlike his colleagues and yet GTB did so by allowing his colleagues to select their PTO in the preceding October such that his PTO requests were subordinate to his colleagues' PTO requests. Doc. 1-1 ¶¶ 16, 17 28-31, 35. He was never told that only six physicians could be scheduled off during one shift. *Id.* ¶ 23. He was also denied a day off when he worked past midnight although other professionals received the day off in such circumstances. *Id.* ¶¶ 25-27. He alleges he

was denied week-long requests for PTO whereas his colleagues were given week-long leave time.[17] *Id.* ¶ 32.

GTB moves for summary judgment on Dr. Farrell's claim of breach of the Employment Agreement due to unequal treatment. The allegations related to GTB's purported unfair treatment of him stem primarily from GTB's system of conducting a PTO lottery in the preceding year. Despite the Employment Agreement stating he is entitled to be treated like his fellow physicians with respect to PTO, he argues that his leave requests were subordinate to his colleagues because they had selected time off through the lottery system in October 2022, before he began working for GTB. Doc. 1-1 ¶¶ 17-20, 28-32.

As pointed out by GTB, the Employment Agreement does not include a provision that all providers are treated the same. The Employment Agreement states that Dr. Farrell "agrees to provide Services at Facilities during mutually agreeable shifts in accordance with the minimum scheduling requirements set forth in Addendum 1." Doc. 1-2 at 2. The "Schedule/Call Requirements" set forth in Addendum 1 were "[a]s required by the Facilities and as *reasonably* scheduled by Company commensurate with the other professionals providing services at the Facilities on behalf of the Company." Doc. 1-2 at 9 (emphasis added). Treating individuals commensurately does not equate to treating them identically. It would be

[17] Although the issue regarding no week-long PTO was raised in the Complaint, Plaintiff appears to have abandoned this argument. He does not respond to this argument in his opposition. Moreover, he did receive week-long PTO in September 2023.

impossible for GTB to treat professionals who started mid-year identically to those professionals who had selected their PTO the prior October. While his colleagues received the benefit of having access to certain dates before he did by virtue of the lottery system occurring before he started, Dr. Farrell had the benefit of not having to choose his PTO for the full year ahead of time.

Under the Agreement, specific dates and availability of sick leave, personal leave, vacation time, and other paid absences must be approved in advance and was subject to GTB's staffing and scheduling needs. Doc. 1-2 at 10. Although the Agreement did not identify that the lottery occurred in October of the preceding year, the Agreement stated that PTO re-sets every calendar year and unused PTO may not be carried over to the next year. *Id.* The Employment Agreement specifically provided that a professional "shall not be entitled to any compensation for such unused or *unavailable* leave time unless approved in advance . . .." *Id.* (emphasis added). Thus, the Agreement itself contemplates that, at times, PTO dates may not be available. Dr. Farrell was aware of the lottery system before he began working for GTB. And it is undisputed that Dr. Farrell participated in the 2024 lottery in October 2023 without incident, and all of his PTO requests for 2024 were approved. Doc. 30 at 173:10-21.

Dr. Farrell fails to point to any genuine issue of material fact that GTB breached the Employment Agreement as it relates to his treatment vis-a-vis his colleagues. Even Dr. Farrell acknowledged that he would not expect the lottery to be re-done every time a new physician is hired. Doc. 30 at 177:15-17. He contends that after he left, GTB instituted a new practice of reserving PTO weeks of departing physicians for newly-

hired physicians who had not participated in the prior year's lottery. Doc. 54 ¶ 16. Nevertheless, GTB's adoption of a new protocol does not support a finding that the Employment Agreement Dr. Farrell signed was breached.

Dr. Farrell argues that he was denied leave at a greater rate than other professionals. Doc. 51 at 4. He also argues the inequity in treatment is evidenced by Defendant's own records. *Id.* at 10. Plaintiff submits that Dr. Magal was hired in February 2024 and informed he had seven weeks of prorated leave. Dr. Lewis, without a request, provided him with eight weeks to choose from and offered: "You are not limited to these weeks, but wanted to give you some options." All of Dr. Magal's leave was scheduled within a matter of days. Dr. Magal's situation does not help Dr. Farrell's cause. Unlike Dr. Magal, the record here shows that Dr. Farrell did not request all of his leave at once as he wanted the flexibility to be able to take care of his father. Given Dr. Farrell's own inaction in identifying proposed PTO dates, he cannot complain he was treated differently when he did not request the leave time up front as Dr. Magal did. Moreover, as discussed in the section below regarding PTO, Dr. Farrell did not request 7 of his 8 remaining PTO days until November 30, 2023. Dr. Farrell acknowledges he was not surprised that there were slim pickings left for December PTO dates.[18] Doc. 30 at 173:25-174:9. And he would not view it as a breach if he made

[18] According to Defendant's records, which Dr. Farrell attaches to his Declaration, GTB does not allow PTO from December 21st through January 2nd as employees are divided into teams and everyone gets an additional 5 days off that do not count against PTO. *See* Doc. 54-1 at 53, 99.

a request for a day off very late in the year, but the date was unavailable. Doc. 30 at 175:21-24. GTB is entitled to summary judgment in its favor on this issue.

**D. PTO**

PTO is offered as an "additional benefit" under the Employment Agreement; it is not identified as "compensation" under the agreement. GTB moves for summary judgment in its favor on the issue of Dr. Farrell's PTO, arguing that it accommodated nearly all of Dr. Farrell's PTO requests and GTB's inability to accommodate two of his twenty-one days of PTO was not a material breach of the Employment Agreement. As the Employment Agreement did not guarantee that all PTO would be available or able to be used, the Court concludes there was no breach.

Dr. Farrell argues that GTB's motion fails because he did not receive 21 days of PTO as required under the Agreement and there are genuine issues of material fact as to whether he was scheduled "commensurate with other professionals." Doc. 51. In support, he contends that the Agreement provides that he was entitled to the same benefits as similarly situated employees and he argues that he has raised numerous examples of disputed fact as to whether he was treated differently than other professionals. The examples of "disputed fact" that he raises do not salvage his claims as the facts are either not in dispute, were not raised as a basis for his claims in his Complaint or are immaterial. *See supra*, Section IV(B) above.

As it relates to his entitlement to 21 days of PTO, Dr. Farrell also claims there are disputes of fact as to the following: Defendant failed to provide Plaintiff with the pro-rated absence from duties promised in the Agreement; pursuant to the

Employment Agreement, Defendant promised to provide 21 days of absence from duty, but failed to provide that leave by repeatedly denying requests for leave, insisting that Plaintiff's only option was "working PTO," and then garnishing his pay so that he did not even receive the pay for the PTO; Defendant denied Plaintiff's request to utilize PTO and be absent from duty; Defendant's offer of "working PTO" did not provide an absence from duties; Plaintiff objected to the offer of "working PTO," asserting that it was creating a fiction of the contractual obligation to provide PTO; Plaintiff's promise of absence from duties was part of the compensation for the services rendered by Plaintiff; it is important for physicians, such as Plaintiff, to be provided time away from duties; Defendant had the discretion to allow Plaintiff to rollover unused leave, but denied it to Plaintiff after he requested it; when physicians worked past midnight on a call day, Defendant had a practice of scheduling those physicians off for the next day; Plaintiff worked after midnight on a call day, but was not scheduled off the next day, commensurate with how his colleagues were scheduled; Plaintiff was forced to resign his employment due to Defendant's breaches and thereafter, Defendant failed to pay him his contracted-for salary and stipend. Doc. 51 at 4-5.

As previously discussed, the Employment Agreement does not provide that Dr. Farrell will be treated identical to other professionals. He was to be scheduled commensurately as his colleagues given the scheduling and staffing needs of TGH. Ultimately, Dr. Farrell was able to use all but two of his 21 PTO days, and he was paid extra for taking "working PTO" on the remaining two. Doc. 30 at 172:18–173:6. The

Employment Agreement provided he was entitled to 21 days of PTO (subject to staffing and scheduling needs), if requested. It is unclear if he even requested the 21st day, but even accepting that he did, Plaintiff acknowledges that requests made late in the year that could not be accommodated would not constitute a breach. Thus, the issue is whether ending the year with two unused PTO days, for which he was paid extra to work those days, would be considered a breach of the Employment Agreement. Dr. Farrell argues that whether "working PTO" satisfied the Agreement is a disputed question of fact precluding summary judgment in GTB's favor. But given that the Agreement contemplated that some PTO days may be unavailable or unused, whether working PTO is the same under the Agreement as PTO is not material to whether there was a breach, given the circumstances of this case.

The Court concludes that the fact Dr. Farrell ended the year with two days of PTO that he was unable to take does not constitute a material breach of the Employment Agreement. The Agreement itself provides that PTO may not be carried over from one year to the next. Thus, this contemplates there may be situations in which a professional is unable to use all of his or her PTO. Stated another way, the Employment Agreement did not guarantee that Dr. Farrell would be able to use all of his PTO because all PTO requests are subject to the hospital's staffing and scheduling needs. Dr. Farrell argues that he never actually got paid premium for the working PTO days. But being compensated for unused PTO days is not guaranteed under the Agreement either. Further, the Agreement permitted GTB to offset Dr. Farrell's $50,000 bonus from his salary as soon as he resigned. Thus, any offsets to his

compensation starting after his December 14 resignation were permitted under the Agreement.

Further, Dr. Farrell contends that GTB breached the Employment Agreement when he worked past midnight and was scheduled to be on PTO that next day. He asserts that his PTO day should have been restored to him, but nothing in the Employment Agreement requires that accommodation. And his reliance on the fact that he was told others may have gotten that accommodation is unavailing. *See Uransky v. First Fed. Sav. & Loan Ass'n*, 684 F.2d 750, 754 (11th Cir. 1982) (applying Florida law) ("It is fundamental that parol evidence is inadmissible to vary or contradict the clear and unambiguous language of a contract."). Thus, not returning a PTO day to him when he worked a shift past midnight is not a breach of the Employment Agreement.

**E. Sign-On Bonus**

The Employment Agreement provided for a signing bonus. Specifically, Dr. Farrell was eligible to receive up to $150,000 to be paid in three equal installments. Dr. Farrell received his initial bonus installment of $50,000 in August 2023. Relevant here, the Employment Agreement provided that if he did not remain continuously employed for twelve months from his start date, he was required to "repay the entire gross amount of Fifty Thousand and No/100 Dollars ($50,000.00), of the first installment of the Sign-On Bonus which repayment [was] due immediately." Doc. 1-2 at 9. It is undisputed that Dr. Farrell did not work continuously for twelve months. He started August 1, 2023; he gave his 90-day written notice about four and one-half months later

on December 14, 2023; and he ended his employment on March 13, 2024. According to the plain language of the Employment Agreement, he was obligated to repay the entire $50,000 initial bonus. Although the Agreement called for the repayment to be made immediately, it gave the option of the repayment being made by an offset against amounts GTB owed Dr. Farrell and that such offsets would begin upon notice of termination. Doc. 1-2 at 10. In accordance with this provision of the Agreement, GTB offset the $50,000 from Dr. Farrell's base salary.

GTB moves for summary judgment on Plaintiff's alleged breach of contract claim as it relates to Dr. Farrell's sign-on bonus and GTB's recouping of the bonus by way of offset from his salary. GTB argues there was no breach of the Agreement because the Agreement allowed GTB to recoup the bonus.

In response, Dr. Farrell argues that because GTB breached the Agreement by not paying all of his moving expenses, Plaintiff was not obligated to repay the sign-on bonus. Doc. 51 at 6. Additionally, Dr. Farrell contends that GTB breached the Agreement by not paying his salary, the sign-on bonus, or his stipend. As discussed in the sections above, the Court concludes there was no material breach as it relates to the delayed payment of moving expenses or for any other reason. And under the Agreement, GTB was entitled to recoup the signing bonus from Dr. Farrell's salary.

As it relates to the stipend, Plaintiff's Complaint does not predicate his breach of contract claim on the non-payment of a stipend. *See* Doc. 1-1. In any event, per the Agreement, the $100,000 pediatric stipend was an annual stipend that was paid in equal bi-weekly installments during a regular pay period following completion of

performance of duties during a two-week pay period. Doc. 1-2 at 9. Because he worked less than a full year, Dr. Farrell was not entitled to the full pediatric stipend.

Regarding the sign-on bonus, the Employment Agreement expressly permits GTB to recoup the sign-on bonus by way of an offset from Dr. Farrell's salary. *See* Doc. 1-2 at 4, 10. GTB did not breach the Employment Agreement when it offset Dr. Farrell's salary to recoup the initial $50,000 sign-on bonus paid to Dr. Farrell. GTB is entitled to summary judgment on this issue.

## V. CONCLUSION

Because Dr. Farrell cannot demonstrate that the delayed payment of his moving expenses was a material breach under the Employment Agreement, Dr. Farrell's motion for summary judgment is due to be denied on this issue and GTB's motion on this issue granted. Similarly, GTB establishes there was no material breach of the Employment Agreement on the issues related to Dr. Farrell's PTO, sign-on bonus, and GTB's treatment of him. Therefore, GTB is entitled to judgment, as a matter of law, on these issues.[19] Accordingly, it is

**ORDERED and ADJUDGED**:

(1) Defendant Gulf-to-Bay Anesthesiology Associates, LLC's Motion for Summary Judgment (Doc. 27) is **GRANTED**.

[19] Because the Court has found that GTB is entitled to summary judgment in its favor as to Dr. Farrell's breach of contract claim, the Court need not reach the arguments raised in the parties' motions pertaining to GTB's affirmative defenses.

(2) Plaintiff Christopher J. Farrell, M.D.'s Motion for Summary Judgment (Doc. 29) is **DENIED**.

(3) The Clerk is directed to enter Judgement in favor of Defendant Gulf-to-Bay Anesthesiology Associates, LLC, and against Plaintiff, Christopher J. Farrell.

(4) The Clerk is further directed to terminate any pending motions and deadlines and **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida on August 24, 2026.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties